In re Cynthia R. MATHIEU, Debtor.

Cynthia R. Mathieu, Plaintiff,

v.

Educational Credit Management Corporation, Defendant.

Bankruptcy No. 12–31428.
Adversary No. 12–3128.

United States Bankruptcy Court,
D. Minnesota.

April 15, 2013.

David E. Albright, Eagan, MN, for Plaintiff.

Henry T. Wang, Gray Plant Mooty Mooty & Bennett PA, Minneapolis, MN, for Defendant.

## ORDER FOR JUDGMENT DISCHARGING STUDENT LOAN

DENNIS D. O'BRIEN, Bankruptcy Judge.

The above entitled matter was tried on January 29, 2013, on plaintiff Cynthia R.

Mathieu's complaint seeking discharge of her student loan owed to defendant Educational Credit Management Corporation. Appearances are noted in the record. Based upon the pleadings, files, evidence received at trial, and arguments of counsel, the Court now makes this **ORDER** pursuant to the Federal and Local Rules of Bankruptcy Procedure.

## I

Plaintiff Cynthia R. Mathieu seeks a hardship discharge under 11 U.S.C. § 523(a)(8) of her student loan in the amount of $140,640.55, held by defendant Educational Credit Management Corporation. In light of the unique facts and circumstances of her case, the Court finds that nondischarge of the obligation would result in an undue hardship on the plaintiff and upon her son, and orders the loan discharged accordingly.

## II

*Employment History And Financial Circumstances.*

The Plaintiff graduated from Creighton University with a B.A. in 1992. Her student loan incurred in connection with the education was $20,800. A short time later, she, and her husband at the time, bought a Fred Astaire Dance studio franchise in Wichita, Kansas, in 1993. She operated the business with her husband until the parties divorced in 1999. She continued operation of the business for a short time alone, but, closed it in 2000. Her son, R.M., was born in July, 1995. R.M. was diagnosed with leukemia and his needs required the plaintiff's full-time attention. After the divorce, it became impossible to keep the business going. In the years 1993 through 1999, the plaintiff's average annual income was $17,900.

Plaintiff was employed in successive, relatively low-paying, jobs from 2000 through 2007. Her average annual income was $9,424, including child support. In 2008, she obtained work at a tax software company, earning a salary in excess of $30,000 per year. Then in 2010, she moved to the Twin Cities and accepted a job as a tax preparer at Quist & Company, a company that had been owned and sold by her father. She subsequently became an Enrolled Agent which enables her to represent the firm's clients before the IRS. She currently earns a gross salary of $50,400 annually at Quist.

Plaintiff is the highest-paid paraprofessional at Quist & Company. She has not received a raise in three years, and is probably at the top end of earning capacity in real dollars in her present profession. Quist & Company first commenced business in January, 2010, when it was purchased from the plaintiff's father. It has lost significant business since then, and the plaintiff testified that she believes that her job security with the company is somewhat questionable.

She is also a waitress on an "on call" basis at a local restaurant. Her work there is sporadic. She worked 12 to 15 evenings between April and October 2012 and has been asked to work approximately 3 evenings in January, 2013, as of the time of trial. She earned approximately $3,000 gross in calendar year 2012 as a waitress. Plaintiff has arthritis in her knees and ankles that is attributable to a former profession as a dancing instructor. She has been prescribed pain/inflammation relief prescription drugs.

Plaintiff has a negative credit score. She drives a nine-year-old car with 126,000 miles on its odometer. She pays interest on her car loan at the rate of 24%. She

testified that the vehicle is in a poor state of repair and is in need of significant transmission work. According to the plaintiff, maintenance has not been performed because she does not have the funds to pay for the repairs. Approximately nine months remains on the car loan at the rate of $360 per month. She testified that she will likely need to obtain a different automobile soon. She testified that her bad credit rating also results in her being unable to obtain automobile insurance at normal rates, and that when she has shopped for insurance, she has been quoted a surcharged rate because of her credit history.

The plaintiff shares her home with a boyfriend, Allen Snyder, who is an over the road truck driver. He earned $38,644 gross income in 2012. Mr. Snyder and the plaintiff share these living expenses:

| Monthly household expenses | | | |
|---|---|---|---|
| Expense | Total | C. Mathieu | A. Snyder |
| Mortgage | $ 982.79 | $ 682.79 | $ 300.00 |
| 2nd Mortgage | $ 200.00 | | $ 200.00 |
| Lot Rent | $ 488.00 | $ 488.00 | |
| Utilities | $ 175.00 | $ 175.00 | |
| Sprint | $ 176.00 | $ 35.00 | $ 141.00 |
| R.M—Trak Phone minutes | $ 35.00 | $ 35.00 | |
| Auto Insurance | $ 130.00 | $ 130.00 | |
| Home Owners Insurance | $ 72.00 | $ 72.00 | |
| life Insurance | $ 60.00 | $ 60.00 | |
| Comcast—Cable | $ 125.00 | $ 25.00 | $ 100.00 |
| MN Revenue 2011 income | $ 50.00 | $ 50.00 | |
| Dakota County Property Tax | $ 34.00 | $ 17.00 | $ 17.00 |
| Attorney's fees | $ 100.00 | $ 100.00 | |
| Health Insurance Premium | $ 412.00 | | $ 412.00 |
| Sirius satellite radio | $ 53.00 | | $ 53.00 |
| Monthly Medical Co–Pays | $ 35.00 | $ 35.00 | |
| Monthly Prescription Co- | $ 82.00 | $ 82.00 | |
| 2012 Medical bills unpaid | $ 25.00 | $ 25.00 | |
| Car Payment | $ 360.00 | $ 360.00 | |
| Gas and maintenance | $ 250.00 | $ 250.00 | |
| Groceries | $ 500.00 | $ 500.00 | |
| Incidentals | $ 50.00 | $ 50.00 | |
| Entertainment | $ 50.00 | $ 50.00 | |
| Fitness center membership | $ 65.00 | $ 65.00 | |
| **Total:** | **$4,509.79** | **$3,286.79** | **$1,223.00** |

The plaintiff and Mr. Snyder purchased the home for $88,425 in June 2011 with the down payment of $10,000 loaned by the plaintiff's father. The loan accounts for the second mortgage on the property. They hold title jointly. The plaintiff testified that she pays more in house related payments and groceries than Mr. Snyder because he is there only a few days a month and she provides for her 17 year old son, who also lives there. According to the plaintiff, there is no equity in the property. Mr. Snyder pays his own truck-

ing related expenses. The parties have no joint bank accounts.

The plaintiff's monthly net income presently is $2,880 from her employment at Quist. Additionally, she receives $438 per month in child support payments, which include arrearages. The support payments will end in July this year. Income from waitressing is sporadic. The plaintiff expects to owe taxes for the 2012 tax year. She has an Edward Jones retirement account that had a balance of $200 at filing.

### Plaintiff's Son.

Plaintiff has one child, R.M., born July 23, 1995. R.M. was born with the learning and social disabilities of attention deficit hyperactivity disorder and Asperger Syndrome. He was stricken with acute lymphocytic leukemia at age 2, but, entered long-term remission two years later in 1999.

R.M. has a serious social and educational deficit. Although he is 17 years old, he is not able to drive because he cannot pass the driver test. The current social goal at Eagan High School is to help him to understand and participate in a job interview by June, 2013. Presently, R.M. is unable to complete a job application because he cannot understand and associate basic questions and appropriate information for responses.

He takes some mainstream classes as well as some classes in the special education department at Eagan High School. He is not expected to be economically or educationally able to live or work independently at the end of his senior year in high school, June 2014. It is not known if or when he might achieve economic or social independence. It has been recommended that R.M. enroll in a six week course of daily therapy/treatment for his symptoms.

The program would require his attendance five days a week for the six week course of treatment. Plaintiff has not been able to provide for the treatment because she cannot afford the daily co-pays and deductibles.

His school district offers a program whereby R.M. could continue to attend Eagan High School special education classes between age 18 and his 21st birthday. After that, the district has no further programs suitable for R.M. and he will likely need to be supported by the plaintiff and any available state or county programs.

Plaintiff and Robert's father divorced in 1999. Plaintiff has always been the sole caretaker of R.M., and testified that she expects to continue in that capacity for the foreseeable future.

### The Loan.

Plaintiff graduated from Creighton University in 1992 with a BA degree. At that time, her aggregate, guaranteed student loan obligation was $20,800, at 9% APR. During the eight year period 1999–2007, she was unable to remain current on the loan due to care of R.M. and her divorce from R.M.'s father. During the period, she earned a total of $66,417 gross earnings, averaging $8,302.12 annually. She also received $7,528.08 in child support from Robert's father. Her total income, earnings and child support, was $73,145.00, averaging $9,424 annually.

During the 2000–2007 time frame, Plaintiff could not pay the monthly payments due under her consolidated guaranteed student loan. She attempted to make payments of less than the monthly amount, but they were not accepted. She was told that only the full monthly payments due could be accepted.

Plaintiff enrolled in a loan rehabilitation program sometime in the middle of the 2000–2007 time-frame. She made a number of payments. It is not clear whether she completed the program. In 2010, at Plaintiff's request, she was again enrolled in a loan rehabilitation program. She made the reduced monthly payments necessary to rehabilitate her loan. However, when the rehabilitation program ended in April, 2011, the required payments exceeded $700 per month.

By January 8, 2012, the balance owing on the loan had grown to $140,640.55. Defendant ECMC proposed a workout plan under either of two available programs. Under one program, IBR, she would pay $339 per month for a period of 25 years. Under the other, ICRP, she would pay $575 per month for the same period. If the program is successfully completed, plaintiff's remaining loan balance, $943,139 under IBR, or $678,554 under ICRP, would be forgiven. She would be 72 years old.

### III

■ The plaintiff seeks a hardship discharge of her student loan under 11 U.S.C. § 523(a)(8). Undue hardship cases must be examined in light of the unique facts and circumstances of each case. In determining dischargeability, courts consider: 1) the debtor's past, present and reasonably reliable future financial resources; 2) calculation of the debtors and debtor's dependents reasonable and necessary living expenses; and, 3) any other relevant facts and circumstances surrounding each particular bankruptcy case. *In Re Long*, 322 F.3d 549 (8th Cir.2003).

■ The plaintiff presently has a modest income. She is forty seven years old

and probably at her peak earing capacity. She has no savings and little in the way of possessions. Her expenses are reasonable and will likely increase over the years, given her intention and commitment to care for her son. R.M. has serious mental deficits and the plaintiff will likely be caring for him in some way for the rest of her life. Mr. Snyder's contributions to the household are reasonable in light of the nature and length of the parties' relationship and his regular and lengthy absences from the home.

The defendant offers two alternative payment programs that it argues would allow for the plaintiff to continue to make payments on the loan. But, the plaintiff's ability to fund either one is doubtful. She will lose child support payments in a few months. Waitressing is sporadic and will not likely make up the difference in lost support. In any event, given her own arthritic condition, waitressing does not appear to be feasible long-term. She would likely fail in either program. But, even if she otherwise had the ability to fund the lesser of the two, those funds will likely be needed for the care of R.M.

■ Under the best of circumstances, the plaintiff would be left with an undue struggle until the age of 72. During that time she would not have access to any reasonable credit due to the ever increasing size of the student loan debt. Under the more likely circumstance of failure, she would be left with a nondischarged increasing debt and no reasonable access to credit ever. The availability of ICRP and IBR repayment programs is not determinative of the issue of undue hardship. *In Re Lee*, 352 B.R. 91 (8th Cir.2006). In this case, given the plaintiff's age, her past, present and likely future struggles in the care of R.M., and her relative lack of re-

sources, the availability of the programs would not alleviate an undue hardship that would result from denying discharge of the loan.

## IV

Based on the foregoing, the Court concludes that the plaintiff's debt to the defendant should be discharged pursuant to 11 U.S.C. § 523(a)(8).

Accordingly, it is hereby **ORDERED** that the student loan debt of plaintiff Cynthia R. Mathieu owing the defendant Educational Credit Management Corporation is or will be discharged by the general discharge entered in her bankruptcy case.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**